UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AUX CAYES FINTECH CO. LTD.,<br>d/b/a "OKEx," d/b/a "OKX,"<br><br>Defendant. | **Information**<br><br>25 Cr. __69__ (KPF) |

**COUNT ONE**
**(Operation of an Unlicensed Money Transmitting Business)**

The Acting United States Attorney charges:

**Overview of the Scheme**

1.  Aux Cayes Fintech Co. Ltd., d/b/a "OKEx," d/b/a "OKX" (hereafter "OKX"), the defendant, is a business entity incorporated in the Seychelles, which operates one of the highest-volume cryptocurrency exchange and trading platforms in the world. From in or about 2018 through in or about at least early 2024 (hereinafter, the "Relevant Period"), OKX operated an unlicensed money transmitting business by serving U.S. retail and institutional customers that engaged in over one trillion dollars of transactions through OKX while OKX failed to register as a money services business ("MSB") with the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN"), as OKX knew was required by U.S. law. As a result of serving U.S. retail and institutional customers while failing to comply with U.S. law, OKX reaped hundreds of millions of dollars in trading fees and profits.

*Legal Background*

2.  Federal law requires a money transmitting business to register with FinCEN as a money services business ("MSB") pursuant to 31 U.S.C. § 5330 and 31 C.F.R. 1022.380 within

180 days of establishment, and to comply with related federal laws, including the Bank Secrecy Act (the "BSA"), that impose certain reporting, recordkeeping, and controls requirements. The applicable federal regulations define money transmitting businesses to include "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means" including through "an electronic funds transfer network" or "an informal value transfer system." 31 C.F.R. § 1010.100(ff). Cryptocurrency exchanges operating wholly or in substantial part in the United States, like OKX, that accept and transmit cryptocurrencies are money transmitting businesses.

3. Because, during the Relevant Period, OKX accepted and transmitted cryptocurrencies to and from retail and institutional customers in the United States and thus operated as a cryptocurrency exchange that did business wholly or in substantial part within the United States, OKX was a money transmitting business that was required to register with FinCEN. As such, OKX was subject to federal laws and regulations that impose certain reporting, recordkeeping, and controls requirements on money transmitting businesses. 31 U.S.C. § 5312. Under the BSA – which is designed to "prevent the laundering of money and the financing of terrorism" and "protect the financial system of the United States from criminal abuse," 31 U.S.C. § 5311 – and its implementing regulations, money transmitting businesses must "develop, implement, and maintain an effective anti-money laundering program," *i.e.*, "one that is reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities." 31 C.F.R. § 1022.210. At a minimum, an effective anti-money laundering ("AML") program must include procedures to verify customer identification, a compliance officer, training and education of appropriate personnel in the AML program, and

provide for independent review to monitor and maintain an adequate program. *See id*. Money transmitting businesses must also identify and report suspicious transactions relevant to a possible violation of law or regulations. *See* 31 C.F.R. § 1022.320.

*OKX's Business*

4.     Since its founding in or about 2017, OKX has been owned and operated by and through one or more associated companies. OKX formerly conducted business under the name "OKEx," but has conducted business under the name "OKX" since approximately January 2022. OKX operates its exchange through employees and offices located in Singapore (since 2022), China, and the United States, among other places. OKX has never registered with FinCEN as a money services business.

5.     OKX has an affiliate U.S. based cryptocurrency exchange named OKCoin USA, Inc. ("OKCoin") which, in contrast with OKX, has registered with FinCEN as a money services business. OKCoin serves customers globally, including in the United States, and offers retail and institutional customers the ability to spot trade, including purchasing cryptocurrency using U.S. dollars. The conduct described herein that gives rise to the charge in the Information is solely that of the unregistered money transmitting business, Aux Cayes Fintech Co. Ltd., d/b/a "OKEx," d/b/a "OKX," the defendant.

6.     Since its founding, OKX has become one of the largest global cryptocurrency trading platforms. According to a third-party website that rates cryptocurrency exchanges based on metrics, including liquidity, trading volumes, and website traffic, OKX is regularly among the three largest derivatives and spot exchanges in the world, with a daily spot trading volume of approximately $5.5 billion and daily derivatives trading volume of approximately $40 billion.

7.     OKX solicits and accepts orders for spot trades in over three hundred

3

cryptocurrencies, including Bitcoin and Ethereum. OKX requires its customers to deposit cryptocurrency into the customer's OKX account prior to the customer being able to trade on OKX. OKX also solicits and accepts orders for derivative products tied to the value of Bitcoin and other cryptocurrencies, including futures contracts. OKX allows its customers to margin and guarantee derivative products, allowing up to 10 times leverage for spot trading and up to 125 times leverage for futures trading.

8. OKX charges its customers fees on transactions, which vary based on a customer's trading volume, with higher-volume traders generally paying relatively lower fees. Because OKX generated revenue through commissions on spot and derivative cryptocurrency trades, OKX needed traders on the exchange who were willing to make markets by offering cryptocurrency in high volumes and at predictable prices. OKX rewarded high-volume customers on its platform, including customers based in the United States, with "VIP" status, which provided discounts on trading fees based on a customer's 30-day trading volume. During the Relevant Period, while typical OKX customers paid a .14% maker fee (for trades where the user offers an asset) and a .23% taker fee (for trades where the user accepts an offer for an asset), OKX's highest-volume VIP customers typically would receive a .01% rebate in lieu of any maker fee and pay a mere .015% taker fee.

9. From its founding through approximately November 2022, OKX allowed retail customers the option to create an account, receive and transfer funds, and place trades without completing a know-your-customer ("KYC") process, and through at least early 2023 OKX allowed accounts created before November 2022 to continue to receive and transfer funds, and place trades, without completing a KYC process.[1]

---

[1] In November 2022 OKX began requiring new customers to provide KYC information during onboarding.

10.     Until approximately early 2024, OKX also allowed customers to place trades on the exchange through third-party entities, without the third-party entity disclosing any identifying information to OKX about the customers on whose behalf the trades were placed. OKX internally referred to these third-party entities as "non-disclosure brokers" or "ND brokers." Trades by anonymous customers could be placed on OKX through a non-disclosure broker until approximately early 2024.

11.     Until approximately May 2023, OKX did not adequately or consistently use commercially available software to monitor and detect suspicious activity, including money laundering, and OKX did not have adequate controls to determine whether either party to transactions on the exchange was potentially subject to sanctions imposed by the U.S. Treasury Department. During the Relevant Period, OKX was used by numerous customers as a vehicle for laundering the proceeds of suspicious and criminal activities, including more than five billion dollars of suspicious transactions and illicit proceeds, based on a review of third-party transaction data.

*U.S. Customers Transacted on the Exchange*

12.     During the Relevant Period, OKX sought out persons in the United States, including in the Southern District of New York, including as follows:

   a.    Since at least 2017, and up to the present, OKX has had an official policy preventing U.S. persons from transacting on its exchange. However, from OKX's founding until at least in or about 2023, OKX nonetheless permitted U.S. persons to register accounts on the exchange and conduct simulated trades (sometimes referred to as "demo trades").

---

In September 2023, OKX began requiring both new and existing customers to provide KYC information, some of which OKX verified. Accounts of existing customers who did not undergo the necessary KYC were placed in withdrawal-only status and the accounts' open positions were closed.

5

    b.  Beginning in or about December 2017, OKX began implementing a policy to block U.S. customers with an internet protocol ("IP") address that was located in the United States from trading or depositing assets onto OKX (the "IP Ban"). OKX also did not allow trading or deposits from customers who identified themselves as United States persons when they registered to trade on the platform.

    c.  As OKX knew, during the Relevant Period, the IP Ban did not, in actuality, prevent U.S. customers from accessing OKX (through a work-around process) and trading on the exchange. Since its founding, OKX's website was accessible from the United States, and U.S. customers could circumvent the IP Ban by using a virtual private network ("VPN") to mask their true location. VPN services have been widely available to the public since OKX's founding at a low cost, with some VPN services charging less than $5 per month. Further, until at least 2023, OKX permitted customers to register an account, deposit cryptocurrency, and place trades on the exchange without providing personal identifying information such as a name, date of birth, and country of residence. U.S. customers could therefore trade, and did trade, on OKX by using a VPN to circumvent the IP Ban and declining to identify themselves or their country of residence during the KYC process. Practically speaking, therefore, OKX understood individuals in the United States were able to easily create and utilize OKX trading accounts contrary to the letter of the company's policy on U.S. customers.

    d.  During the Relevant Period, OKX also allowed U.S. customers to trade through non-disclosure brokers. As described above, from its founding through approximately early 2024, OKX allowed non-disclosure brokers to place trades for their customers on OKX without providing KYC information to the exchange for the customers on whose behalf the trades were placed. Non-disclosure brokers therefore allowed customers, including U.S. customers, to

conduct trading activity on OKX without disclosing their identity to OKX.

e.   After OKX began requiring all customers to provide certain KYC information to trade, on certain occasions OKX employees advised customers how to provide inaccurate information to circumvent the company's KYC process and official policy prohibiting U.S. customers. For example, in April 2023, an OKX employee encouraged a potential U.S. customer to open an account by providing false information about the customer's nationality during the KYC processing, writing "I know you're in the US, but you could just put a random country and it should go through. You just need to put Name, nationality, and ID number. You could just put United Arab Emirates and random numbers for the ID number." At that time, OKX did not verify the information that customers provided to open an account to trade. In January 2024, the same employee wrote to another potential U.S. customer and asked if the individual had "any workaround on KYC outside of the US to make it potentially work."

13.   It was publicly known since OKX's founding that OKX was readily accessible to U.S. customers despite the IP Ban and official policy prohibiting U.S. customers. Multiple posts on prominent social media websites reported that OKX could be accessed by U.S. customers by using a VPN. Additionally, OKX promoted itself on social media as an exchange that allowed its customers to trade without providing identifying information. For example, in approximately 2022, in response to a social media thread entitled "OKX REQUIRES KYC FROM ITS CUSTOMERS?" an account affiliated with OKX wrote, "KYC is not mandatory for our users to trade on OKX."

14.   During the Relevant Period, OKX and certain of its employees knew that U.S. customers were registering and trading on OKX despite the IP Ban and OKX's official policy prohibiting U.S. customers. For example, in an October 2020 internal email, an OKX employee

7

wrote that the IP Ban could be circumvented because "it can't rule out cases where users use VPN[s] to hide their real IPs." Similarly, in a 2021 internal OKX message amongst business development employees at OKX, one OKX employee asked, "how do we work with brokers who have customers from US" and noted "I know that US citizens are not allowed to trade on OKEX," to which another OKX employee responded "VPN." Additionally, in 2022, an OKX marketing employee suggested in an internal OKX message that OKX market the exchange to "US day traders who'd know to use a VPN for the exchange," and a senior OKX marketing officer responded with a "thumbs up," indicating approval of the suggestion. Moreover, in a 2023 internal chat with an OKX employee, a senior OKX executive acknowledged that there had been an issue that "without full kyc, US people can use vpn to skip our IP ban."

15. During the relevant period, OKX also received multiple reports of telecommunications traffic based in the U.S. with OKX, which indicated that a substantial number of U.S. persons were regularly accessing OKX's website. Among other things, OKX received regular reports from a prominent online search company reflecting that tens of thousands of U.S. I.P. addresses were used to access OKX's website from the company's search engine each month. Additionally, another company that provided two-factor authentication services to access OKX accounts sent OKX monthly bills reflecting that tens of thousands of two-factor authentication messages were being sent to customers in the United States each month.

16. In addition to knowing that U.S. persons were accessing OKX's website and trading on the exchange, at times during the Relevant Period, OKX marketed itself within the United States. For example, OKX has sponsored the annual Tribeca Film Festival, which takes place in downtown Manhattan, since at least 2022. As a result of this sponsorship, OKX was promoted alongside the Tribeca Film Festival through multiple ads posted throughout Manhattan. OKX also

8

promoted the exchange within the United States through affiliate marketing campaigns, a practice through which third-parties known as "affiliates" promoted OKX and received a portion of the fees generated by new customers who they recruited to join OKX. During the relevant period, OKX sought to use and used affiliate marketers based in the United States to promote the exchange. OKX also allowed existing customers to promote the exchange, and provided such customers benefits for recruiting additional users. At least one OKX customer produced a publicly-available, step-by-step instructional video educating U.S. customers about how to register with OKX using a VPN.

*U.S. Institutional Customers Provide Liquidity on the Platform*

17. OKX also focused its efforts on attracting and retaining certain institutional customers that had a sufficient U.S. nexus to render them U.S. persons under the law ("U.S. Institutional Customers"), including large institutions who could provide liquidity for cryptocurrency trades on the OKX platform and help OKX become one of the world's largest cryptocurrency exchanges by making a broad range of cryptocurrencies available at competitive rates.

18. OKX's goal of attracting and retaining certain U.S. Institutional Customers was reflected in certain internal company documents, including a document entitled "Trust and Product," which was prepared and maintained by certain OKX employees. The "Trust and Product" document outlined and recommended strategies for OKX to "improve brand trust in the United States" and discussed trading activity on OKX by multiple large U.S. institutions. The "Trust and Product" document further made recommendations for how OKX could improve its relationship with U.S. Institutional Customers and increase the trading volume on OKX.

19. OKX onboarded foreign-incorporated companies that OKX knew were affiliated

9

with and controlled by large U.S. based institutions. During the Relevant Period, OKX allowed several U.S. Institutional Customers to trade on the exchange, which generated additional liquidity, volume, and trading fees.

20.     U.S. Institutional Customers were responsible for significant volume on the exchange and were some of OKX's largest customers. A particular U.S. Institutional Customer, for example, conducted approximately $1.2 trillion in spot and derivatives transactions from in or about 2019 through in or about 2023, and was among OKX's four largest customers during each of those years. In 2020, two of OKX's three largest customers were U.S. Institutional Customers.

21.     OKX's U.S. Institutional Customers therefore contributed substantially to OKX's growth and its bottom line, despite OKX's failure to register as a money services business with FinCEN and OKX's official policy banning U.S. customers from the exchange.

## **Statutory Allegations**

22.     From at least in or about 2018 through in or about at least early 2024, in the Southern District of New York and elsewhere, AUX CAYES FINTECH CO. LTD, d/b/a "OKEx," d/b/a "OKX," the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; and (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, OKX transmitted money into and through the United States, including into and through the Southern District of New York, by operating an unlicensed cryptocurrency exchange through which United States residents and financial institutions placed billions of dollars of transactions.

(Title 18, United States Code, Sections 1960 and 2.)

## FORFEITURE ALLEGATION

23. As a result of committing the offense alleged in Count One of this Information, AUX CAYES FINTECH CO. LTD, d/b/a "OKEx," d/b/a "OKX," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to $420,353,574, representing the amount of property involved in said offense.

### Substitute Assets Provision

24. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
MATTHEW PODOLSKY
Acting United States Attorney

11